**The below described is SIGNED.**

**Dated: March 31, 2011** 

                                **R. KIMBALL MOSIER**
                                **U.S. Bankruptcy Judge**



## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Devin J. Dehlin and Joanne Dehlin,<br><br>                Debtors, | Bankruptcy Number: 09-20955<br><br>Chapter 7<br><br>Judge R. Kimball Mosier |
| Cyprus Credit Union,<br><br>                Plaintiff,<br>v.<br><br>Devin J. Dehlin and Joanne Dehlin,<br><br>                Defendants. | Adversary Proceeding No. 09-2176 |

## MEMORANDUM DECISION

This matter came for trial before the Court on January 6, 2011. The adversary proceeding originated when Cyprus Credit Union (Cyprus) timely filed a complaint seeking to except its debt from the bankruptcy discharge of Devin J. Dehlin and Joanne Dehlin (the Debtors) for a loan that originated in June of 2006. The issue before the Court is whether the debt resulting from a loan advanced by Cyprus to the Debtors should be excepted from discharge

under 11 U.S.C. § 523(a)(2)(B).[1]  Because Cyprus has failed to carry its burden of proof to show that the Debtors' representations were materially false, or that the Debtors made the representations with intent to deceive Cyprus, or that Cyprus reasonably relied on the Debtors' representation, the debt is not excepted from discharge.

## JURISDICTION

Cyprus commenced this adversary proceeding seeking to except its debt from the Debtors' discharge.  This is an action seeking exception to discharge under § 523 and is a "Core" matter under 28 U.S.C. §§ 157(b)(2)(I) and (J) and 1334.

## FACTS

**The Loan Application.**  In the spring of 2006, the Debtors approached Mark Meersman (Meersman), a principal at American Funding Group (AFG), to obtain a loan in the amount of $787,500 to fund the construction of a home they were proposing to build.  AFG is a broker for mortgage and construction loans.  Meersman prepared the Debtors' loan application (Loan Application).  The Loan Application form is titled Uniform Residential Loan Application.  To assist in the preparation of their Loan Application, the Debtors provided Meersman with information respecting both of their incomes, assets, and liabilities.  The information provided to Meersman by the Debtors included copies of both of the Debtors' pay stubs (wage statements) reflecting the year to date income.

---

[1] The complaint filed by Cyprus was brought under 11 U.S.C. § 523(a)(2)(A), (B), and (a)(6), but, at trial, Cyprus elected to proceed only under § 523(a)(2)(B).

Statutory references herein are to Title 11 of the United States Code (2006), unless stated otherwise.

2

Section V of the Loan Application form is a table titled "Monthly Income and Combined Housing Expense Information," which contains a column titled "Gross Monthly Income." The column titled "Gross Monthly Income" has a number of rows, the first of which is labeled "Base Empl. Income*."[2] The column titled "Gross Monthly Income" contains a number of additional lines[3] including a line designated as "Other," but the column does not contain a line for K-1 income, self-employment income, or capital gains income. The Loan Application form does not advise applicants to exclude K-1 income, self-employment income or capital gain income. AFG placed all of the Debtors' income on the line designated as "Base Empl. Income*," including the Debtors' K-1 income, self-employment income, and capital gains income. AFG placed the figure of $9,800.00 for Borrower and $8,500.00 for Co-Borrower on the line designated as "Base Empl. Income*." There was no evidence offered to explain why Meersman completed the Loan Application as he did or what decision making process was utilized by Meersman to decide where the Debtors' income figured should be entered on the Loan Application form.[4] There was no evidence that the Debtors discussed the interpretation or meaning of "Base Empl. Income*" with Meersman. Both of the Debtors signed the Loan Application form prepared by Meersman without modification. When asked why he signed the Loan Application form as prepared by Meersman, Devin Dehlin testified that he considered Meersman to be the professional with

---

[2] The asterisk attached to the words "Base Empl. Income" references the following text: "Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements."

[3] The additional lines found in the column are labeled: "Overtime," "Bonuses," "Commissions," "Dividends/Interest," "Net Rental Income," and "Other."

[4] Neither party choose to offer the testimony of Meersman at trial to explain why the Loan Application was completed in the way that it was.

respect to the preparation of loan applications and signed the Loan Application form promptly and with minimal review.

In the spring of 2006, AFG was referring some of its clients to Cyprus for construction loans. After collecting the Debtors' information, preparing the Loan Application and obtaining the Debtors' signatures, Meersman presented the Loan Application to Cyprus for its review. There was no evidence that the Debtors ever had any direct discussions with Cyprus regarding the Loan Application.

**Loan Officer's Review of the Loan Application.** The Loan Application prepared by Meersman was forwarded to Royce Wahnschaffe (Wahnschaffe), a construction loan officer employed by Cyprus. Wahnschaffe characterized the loan made by Cyprus to the Debtors as a "stated income loan." According to Wahnschaffe, a "stated income loan" is a loan where applicants need only state what their income is on the loan application without the need to provide the lender with verification of their stated income.[5] Wahnschaffe described Meersman and AFG as knowledgeable of Cyprus's policies and requirements for "stated income loan" applications. Wahnschaffe testified that Cyprus offered "stated income loans" to its credit union members as a matter of convenience for the members. Wahnschaffe also testified that Cyprus's review of a "stated income loan" application focused on an applicant's "three C's"—character, capacity, and collateral. Character is the applicant's credit score and whether the applicant tended to abuse credit cards by running them to their maximum. Capacity is defined as the applicant's earning power and ability to service the loan from his or her income. Collateral is the

---

[5] Cyprus's representative Todd Adamson testified that a "stated income loan" commands a higher interest rate than a conventional loan because of the higher risk associated with writing a loan without documentation regarding the borrower's income.

value of collateral pledged by the applicant, which is compared to the amount of the loan. When considering collateral, the amount of the loan is divided by the value of the collateral to obtain a loan-to-value ratio. Cyprus's lending policy for "stated income loans" permitted loan-to-value ratios as high as 80%. The loan-to-value ratio of the Debtors' loan was 72%.

Wahnschaffe testified that Cyprus relied heavily upon an applicant's credit score and looked carefully at the loan-to-value ratio when considering "stated income loans." According to Wahnschaffe, if an applicant's credit score and loan-to-value ratio were both within Cyprus's accepted ranges, then Cyprus would be satisfied with the applicant's stated income with no verification. For example, Wahnschaffe testified that if an applicant's tax return was provided as a part of the file with a "stated income loan" application, the tax return information would be disregarded if the applicant's character and loan-to-value ratio were both satisfactory.

**The Underwriting Committee's Review.** Wahnschaffe further testified that once review by a loan officer was complete, a loan application was then reviewed by the Underwriting Committee (Committee). Review of a loan application by the Committee commenced with delivery of a loan packet and cover sheet to the Committee. The Committee reviewed the cover sheet of each loan packet line item by line item. The Committee did not make decisions based upon any one line item. Todd Adamson (Adamson), CEO of Cyprus and a member of the Committee, testified that an applicant's employment—the type of job, the length of employment, and the income level—was a primary consideration, and that the type of employment—whether it be W-2 employment or self-employment—and whether the income was stated income or proven income were important considerations. Adamson testified further that an applicant's credit score was a significant factor in the loan application review. Other factors identified by

5

Adamson that were of interest to the Committee included an applicant's debt ratio, the loan-to-value ratio, the unsecured debt ratio, whether an applicant was a member of Cyprus, the identity of the builder for a construction loan, the identity of the broker, an applicant's home location, an applicant's mortgage history, and the relative sizes of an applicant's present mortgage and proposed mortgage.

An applicant's income would be reviewed by the Committee for reasonableness taking into consideration the identity of the applicant's employer, the type of employment, and the applicant's number of years at the job. Adamson testified that Cyprus expected the applicant's "Base Empl. Income*" found in a loan application to be an applicant's W-2 employment income. Adamson testified that Cyprus does not consider K-1 income and capital gains income to be "monthly income" for purposes of the Loan Application form. He testified that if the Committee runs across a "red flag" during the application review process, then the Committee will do more due diligence before approving the application.

Adamson testified that Cyprus relied upon the broker referring the loan to Cyprus to ensure that the information in a loan application is correctly stated, and that it was very important to Cyprus that the brokers understood Cyprus's policies[6] because it was Cyprus's desire for all of the construction loans approved by Cyprus to receive secondary market approval. Cyprus wanted its construction loans to have secondary market approval because Cyprus was interested in writing construction loans but did not want to serve as the holder of the note on a long term basis.

---

[6] Cyprus did not introduce any evidence, however, that Meersman or AFG made the Debtors aware of Cyprus's policies.

6

The Debtors' Loan Application form, as completed by Meersman and signed by the Debtors, showed Joanne Dehlin's employment as a dental hygienist for Miller Keefe Miller with a 16-year employment history and Devin Dehlin's employment as a golf pro for Salt Lake County with 10 years employment. According to Adamson's testimony, he assumed that Joanne's monthly income as a dental hygienist was $9,800/month and Devin's monthly income as a golf pro for Salt Lake County was $8,600/month and the Debtors' total combined monthly W-2 income was $18,400. Adamson described the Debtors' Loan Application as a strong application and did not identify any red flags with the application.[7]

**The Debtors' Income.** The evidence shows that the Debtors' 2006 combined income from all sources averaged more than $18,400/month and that the Debtors' W-2 income was considerably less. The difference between the Debtors' total income and the Debtors' W-2 income is made up of income derived from the Debtors' K-1 income and distributions, self-employment income from the Debtors' various businesses, and capital gains income. This income, including the capital gains income, resulted from the Debtors' personal services, not investments.

## ANALYSIS

Section 523(a)(2)(B) provides that a debt may be excepted from discharge "to the extent [the debt was] obtained by . . . use of a statement in writing (i) that is materially false; (ii) respecting the debtor's . . . financial condition; (iii) on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and (iv) that the debtor caused to be made or

---

[7] Apparently, the Committee did not view either the stated income of $9,800/month for a dental hygienist or $8,600/month for golf pro employed by Salt Lake County as red flags.

7

published with intent to deceive . . . ." "[E]xceptions to discharge under § 523(a) are to be narrowly construed, and[,] because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[8] The burden of proving each element of § 523(a)(2)(B) must be carried by the party seeking an exception to discharge, and the standard of proof for the dischargeability exceptions under 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard.[9]

**Materiality of the Representation.** A misrepresentation is material if a reasonable lender would consider important the fact misrepresented.[10] Cyprus argues that the "Gross Monthly Income" figures found on the Debtors' Loan Application form are a material part of the Loan Application and represent an important fact involved with Cyprus's loan approval process. The Court agrees and finds that the "Gross Monthly Income" figures set forth in the Loan Application form are a material part of the Debtors' representations to Cyprus.

**Falsity of the Representation.** If a representation is solicited, then to analyze whether a representation is true or false, one must consider both the question and the answer. In this case, the question the Debtors responded to is found in the Loan Application form which asked that the Debtors' "Gross Monthly Income" be set forth on a table. Whether the Debtors' answer to that question was materially false depends upon the interpretation of the Loan Application form. Cyprus maintains the Loan Application form does not allow for K-1 income or capital gains

---

[8] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

[9] *See Grogan v. Garner*, 498 U.S. 279, 288–91 (1991).

[10] *See Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764, 768 (10th Cir. 1998).

income. The Debtors maintain that they believed, on advice of AFG, that all income may be included in "Gross Monthly Income."

The Loan Application form provides minimal guidance for completing the "Gross Monthly Income" information to be placed in the table. There is no separate line found in the column labeled "Gross Monthly Income" designated for the entry of an applicant's K-1 income, self-employment income or capital gains income. Conversely, there is no instruction that an applicant's K-1 income or capital gains income should be excluded from "Gross Monthly Income."

The information solicited is to determine an applicant's ability to service the loan, and, absent instruction to the contrary, an applicant may believe that K-1 income and capital gains income should be included in "Gross Monthly Income." Since there is no separate line or instruction respecting the applicant's K-1 income and capital gains income, an applicant need not conclude that K-1 income and capital gains income must be excluded and could conclude that this income may be entered on the line labeled "Base Empl. Income*", especially if such income was related to the applicant's personal services.

At best, Cyprus has shown that the Debtors and AFG may differ with Cyprus in their opinions of how the instructions for the Loan Application form are to be interpreted and how the form should be completed. There is no evidence that the Debtors were instructed or advised that the income entered on the line labeled "Base Empl. Income*" should be limited solely to the Debtors' W-2 employment income. Because the Loan Application form was adopted by Cyprus, it is Cyprus who choose the words of the Loan Application form. When a contract is ambiguous,

9

courts will adopt the meaning that is less favorable to the party who chose the words.[11] The Court finds that the Loan Application form as drafted, allows an applicant to include K-1 income and capital gains income in "Base Empl. Income*."

The evidence established that if the Debtors' income from all sources is considered, the representation of "Gross Monthly Income" was not materially false. Cyprus has failed to carry its burden that the gross monthly income figures entered on the Loan Application form are false.

**Intent to Deceive.** When determining intent, a court may consider not only a debtor's "conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations."[12] The intent to deceive "may be inferred [also] from a sufficiently reckless disregard of the accuracy of the facts."[13]

Initially, the Court notes that there was no evidence that the Debtors were ever informed that their loan was being treated as a "stated income loan." In fact, there was no evidence regarding how and when Cyprus determined that the Debtors' loan should be treated as a "stated income loan." The Loan Application form is a Uniform Residential Loan Application, and makes no reference to being a "stated income loan" application. The Debtors provided AFG with paystubs (wage statements) consistent with a belief that Cyprus would require that information. The only document evidencing that the Loan Application was for a "stated income loan" is exhibit 14, the Construction Loan Approval Worksheet, that has a box marked that the

---

[11] *See Ellsworth v. Am. Arbitration Ass'n*, 148 P.3d 983, 988 (Utah 2006).

[12] *Groetken v. Davis* (*In re Davis)*, 246 B.R. 646, 652 (10th Cir. B.A.P. 2000).

[13] *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir. 1986).

borrowers' income was based on stated income as opposed to paystub income or taxes income. This document was prepared by Cyprus for its use.

Given the structure of the table and the minimal guidance provided with the table, it is not unreasonable for the Debtors to have completed the Loan Application form in the manner they did. The Debtors provided AFG documentation regarding their income. The Debtors did not talk to Cyprus about the Loan Application form and there was no evidence presented that the Debtors disregarded a specific instruction with respect to their representation of "Gross Monthly Income." All of the evidence suggests that the Debtors did not intend that Cyprus simply rely on their representation of "Base Empl. Income*" as a representation of their W-2 income. Without being given more specific instructions on how to complete the Loan Application form, including the Debtors' K-1 income, self-employment income, and capital gains income on the line labeled "Base Empl. Income*" was, at most, a mistake made by AFG and adopted by the Debtors when they signed the Loan Application form. "A debtor will not be denied [a] discharge if a false statement is due to mere mistake or inadvertence."[14] Cyprus has failed to carry its burden of proving that the Debtors prepared the Loan Application form with an intent to deceive Cyprus with respect to their income.

**Reasonable Reliance**. Paragraph 3(g) of the amended stipulated pretrial order entered January 6, 2011 identifies the following as an uncontroverted fact: "Plaintiff reasonably relied on the Application's income statement and approved the construction loan." "A pretrial order . . . is the result of a process in which counsel define the issues of fact and law to be decided at trial,

---

[14] *Gullickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1294 (10th Cir. 1997).

and it binds counsel to that definition."[15] Although the terms of a pretrial order may be binding upon the litigants, "there is nothing in . . . [pretrial] rulings, even if they be called '[pretrial] orders,' to prevent [a] trial judge from changing his mind about the applicable law of the case" if the circumstances so require.[16] At trial, instead of relying on the pre-trial order, Cyprus caused a significant number of facts to be introduced into evidence during the direct examination of witnesses called by Cyprus that went directly to reasonable reliance. The Court bases the portion of this ruling that addresses the issue of reasonable reliance only upon facts that were placed into evidence at trial by Cyprus on direct examination of witnesses called by Cyprus to testify in behalf of Cyprus. Because the weight of the testimony and evidence presented regarding reliance points in the same direction, the Court cannot ignore the evidence and must discuss the issue of Cyprus's reasonable reliance.

The uncontroverted facts put into evidence by Cyprus are as follows: In the spring of 2006, Cyprus was in the business of making "stated income loans." Applicants that applied for a "stated income loan" from Cyprus were not required to provide any documentation to support whatever income figure the applicant chose to enter on the loan application. Further, Wahnschaffe testified that if an applicant provided Cyprus with documented proof of the applicant's income, the documented proof would be disregarded by Cyprus. Adamson testified that the nature of an applicant's employment and whether income was stated or proven were important considerations. The Debtors' Loan Application form stated that Joanne, a dental

---

[15] *R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987); *see also Amphibious Partners, LLC, v. Redman*, 534 F.3d 1357, 1361 (10th Cir. 2008).

[16] *Lumbermens Mut. Cas. Co. v. Rhodes*, 403 F.2d 2, 8 (10th Cir. 1968).

hygienist, had an income of $9,800/month and that Devin, a Salt Lake County employee, had an income of $8,600/month. Even though Adamson testified that the type of an applicant's employment was a consideration, apparently, the Debtors' Loan Application did not trigger any red flags upon review. Cyprus relied upon the brokers who referred loan applicants to Cyprus to assure that an applicant's stated income found on the line labeled as "Base Empl. Income*" was limited to W-2 income only. The wage statements Cyprus introduced at trial clearly show that AFG faxed the wage statements to someone about the time the Loan Application was made. However, Cyprus did not produce any evidence regarding its receipt of wage statements. Cyprus did not interview the Debtors and did not provide any instruction or guidance directly to the Debtors about how the Loan Application should be completed, and did not provide the Debtors with any information about Cyprus's loan policies.

The reasonable reliance required under § 523(a)(2)(B) is measured by an objective standard.[17] "The standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon [a] debtor's representations."[18] If "minimal investigation and verification almost certainly would have uncovered the falsity of a debtor's representations," a creditor's reliance may not be reasonable.[19] Because a creditor has the responsibility to ensure there is some basis to rely on a debtor's representation, a debtor's representation, by itself, can not be the basis for a creditor's reasonable reliance.

---

[17] *See Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 713 (10th Cir. 2005) (quoting *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 503 (Bankr. S.D.N.Y. 1999)).

[18] *Leadership Bank, N.A. v. Watson (In re Watson)*, 958 F.2d 977, 978 (10th Cir. 1992) (quoting *First Bank of Colo. Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987)).

[19] *See Mullet*, 817 F.2d at 681.

When analyzing why "reasonable" reliance should be required under § 523(a)(2)(B) when only "justifiable" reliance is required under § 523(a)(2)(A), the U.S. Supreme Court stated:

> The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.[20]

Cyprus argues that it "followed its procedures" in approving the Debtors' loan and reasonably relied on the Debtors' statement of income. Cyprus's only basis to rely on the Debtors' representation of the Debtors' income was the Debtors' representation of the Debtors' income. Accepting Cyprus's procedures would effectively allow Cyprus to rewrite § 523(a)(2)(B)(iii) and eliminate the requirement of reasonable reliance. This is exactly the type of practice that encourages falsity that the Supreme Court alluded to in *Field v. Mans*.

Some courts have held that a lender's reliance on "stated income" may be reasonable,[21] but the reasonableness of such reliance becomes more dubious as the amount of the "stated income loan" increases. Cyprus took no steps whatsoever to verify the Debtors' incomes despite being asked to lend $787,500 to a dental hygienist with a stated income of $9,800/month and a government-employed golf pro with a stated income of $8,500/month. Cyprus has made no showing of reasonable reliance. In fact, the opposite is true—Cyprus remained willfully ignorant. Cyprus ignored the nature of the Debtors' employment, information it deemed important. Cyprus did not request verification of the Debtors' income and if Cyprus received

---

[20] *Field v. Mans*, 516 U.S. 59, 76–77 (1995).

[21] *See, e.g.*, *Home Loan Corp. v. Hall (In re Hall)*, 342 B.R. 653 (Bankr. M.D. Fla. 2006); *Master Fin., Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456 (Bankr. M.D. Fla. 2005).

any documentation regarding the Debtors' income it was disregard. The Court does not know why Cyprus instituted its procedures for "stated income loans" but a creditor's self created procedures that excuse reasonable reliance can not insulate the creditor's claim from discharge. In this case, Cyprus has failed to carry its burden on proof and establish that it reasonably relied on the Debtors' representation of income, and the debt will not be excepted from discharge.

**Attorney Fees.** Paragraph 15(c) of the Construction Loan Agreement provides that in any legal proceeding relating to the loan agreement, the prevailing party shall be entitled to an award of reasonable attorney fees and court costs incurred in such proceedings, including attorney fees and costs incurred in defending any counterclaims. The Debtors have introduced evidence that the legal representation in this adversary proceeding was performed by the Debtors' counsel for a flat fee of $10,000. Given the complexity of the controversy and the time expended in litigation, the Court finds that $10,000 is a reasonable attorney fee, and that pursuant to paragraph 15(c) of the loan agreement, the Debtors should be awarded $10,000 reimbursement for their attorney fees and costs.

---------------------------------------------- End of Document----------------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **Memorandum Decision** will be effected through the Bankruptcy Noticing Center to the following parties.

Edward J. Stone
The Stone Law Firm
859 East 900 South
Suite 201
Salt Lake City, UT 84105

Richard C. Terry
Terry Jessop & Bitner
39 Exchange Place
Suite 100
Salt Lake City, UT 84111

Office of the United States Trustee
Ken Garff Building
405 South Main Street, Suite 300
Salt Lake City, UT 84111